JOHN S. WILLS v. WILLIAM McKINNEY.

1. The plaintiff in a junior judgment, by suing out and levying the first execution upon land, acquires a priority of lien. It is essential for the maintenance of a priority of lien on land under execution, by a senior over a junior judgment, that there should be a levy on it after recording and delivering the writ to the sheriff.

2. Alterations made in the levy after return, without the authority or knowledge of the sheriff or plaintiff, diminishing the number of acres in the levy, held void, and the original number restored.

3. The description of the land levied on in the return will exclude parol proof that the sheriff intended to levy on all the lands of the defendant in execution.

4. The rule of construction in description of land stated in *Griscom* v. *Evans*, 11 *Vroom* 402, approved and followed.

The plaintiff, John S. Wills, recovered judgment in this court against the defendant, William McKinney, August 12th, 1875, for $4664.79. A writ of *fieri facias* was issued, recorded and delivered to the sheriff of the county of Sussex, August 16th, 1875. It was levied on personal property and lands of the defendant in said county, on the same day, and stayed by the plaintiff until further order, or a junior execution should come into the hands of the sheriff. November 10th, 1877, John McKinney obtained a judgment in this court, against the said William McKinney, for $555.01, and on November 12th, 1877, Hannah L. McKinney recovered a judgment in the Sussex Circuit Court for $551. On these two last-named judgments writs of execution were issued, recorded and delivered to the sheriff of Sussex county November 12th, 1877, and levies made on personal property and lands of the defendant, William McKinney, including "a tract of land in the township of Andover, containing forty acres, more or less, being the same land and premises conveyed to William McKinney by John McCarter and wife, by deed bearing date June 1st, 1868, and recorded," &c. December 26th, 1877, a *pluries fi. fa.* was issued by the plaintiff, John S. Wills, which was duly recorded and delivered to the sheriff, December 31st, 1877, and levied on the same property described in the returns to the executions at the suits of John McKinney and Hannah L. McKinney.

The plaintiff, John S. Wills, claimed that his first execution was the earliest lien on the McCarter tract of forty acres of land. This claim was disputed by John McKinney and Hannah L. McKinney, and the parties agreed that the land should be sold, and the proceeds brought into this court, where the priorities of the judgments and executions of the parties should be determined. The proceeds of sale being in court, the plaintiff, John S. Wills, moves that they be applied towards the payment of his judgment, as the first lien on the land sold.

Argued at November Term, 1878, before Justices DAL-RIMPLE and SCUDDER.

For the plaintiff, *Mills & Church.*

For the other plaintiffs in execution, *C. D. Thompson.*

The opinion of the court was delivered by

SCUDDER, J.   It appears from the records in this case that the plaintiff obtained the first judgment against the defendant, and that his execution thereon, duly recorded, was promptly delivered to the sheriff and a levy made.   By statute, (*Rev.,* *p.* 520, § 2,) a judgment binds lands of the defendants from the time of the actual entry of such judgment on the minutes or records of the court.   But this general lien is not perfected against all claimants until something more is done, for to maintain its priority over subsequently issued executions against lands, the execution must be recorded.   *Rev., p.* 389, § 2. Then it shall have priority and preference from the time that the writ shall be delivered to the sheriff.

It has been said that the statute making the judgment a lien on land is broad enough to complete the lien without a levy, and it has been held elsewhere that the delivery of the *fi. fa.* against lands gives no new rights to the plaintiff, and vests no new interests; that the general lien is created by the judgment, and the execution is merely to give that lien effect, not by vesting a possessory right in the lands affected by it in the plaintiff, but by designating it for a conversion into money by the operation of the *fi. fa.,* and the act of the sheriff by virtue of it.   *Catlin* v. *Jackson,* 8 *Johns.* 520, 547.

It was accordingly decided, in *Wood* v. *Colvin* 2 *Hill* 228, that it was not necessary for the sheriff to make any formal levy or seizure before proceeding to advertise and sell land; that the execution comes as a power to enable the creditor to reap the fruits of the seizure already made by the lien under the judgment.

But our statutes do not stop at this point, where the judgment is made a lien on lands, for it is further enacted that the sheriff or other officer who, by virtue of any writ of execution, shall sell any lands, tenements, hereditaments and real estate *levied on,* shall make to the purchaser thereof a deed, &c.

*Rev., p.* 1043, § 7. And in section nine of the same statute, (*Rev., p.* 1044,) it is enacted that the purchaser of lands under junior executions shall hold them free and clear of all other judgments, on or by virtue of which no execution has been taken out *and executed* on the lands so purchased. The word " executed," here used, has been construed to mean " levied." *Den* v. *Young,* 7 *Halst.* 300.

Chief Justice Ewing, in giving this construction, says: " The legislature intended that something more should be done than merely to take out execution; for it might be levied on some and not on all of the lands of the defendant; and if so, the lands not levied on, if purchased, might, in good policy, be cleared from the judgment, as the plaintiff had not thought fit to extend his execution to them."

This subject is carefully considered in *Clement* v. *Kaign,* 2 *McCarter* 47; and these sections of different statutes, which have been changed from their original places, are held to be *in pari materia,* forming part of one entire system, and that the plaintiff in the junior judgment, by suing out and levying the first execution upon the land, acquires a priority of lien. It is essential, therefore, for the maintenance of a priority of lien on land under execution, by a senior over a junior judgment, that there should be a levy on it after recording and delivering the writ to the sheriff. If no levy is made on the land of the defendant when the execution on the senior judgment is returnable, its preference is gone. It is claimed in this case, that the first execution of the plaintiff, John S. Wills, was not levied on the forty-acre tract of land belonging to the defendant, William McKinney, at the time it was in force, and that no other *fieri facias* was issued by the plaintiff on his judgment, prior to the executions of John McKinney and Hannah L. McKinney, on their judgments. The controverted fact in this case is whether there was such levy under the first execution. The return on the writ shows, among other property, that a levy was made " on a farm situate, lying, and being in Andover township, Sussex county, N. J., containing 75 acres of land, more or less, and is

what is called the Andover farm, and is now occupied by Dayton McKinney, and is joined by lands of John S. Wills, ———— White, and others." The question is whether this Andover farm, thus described, was intended to include this forty-acre lot.

It appears, from the depositions taken, that the farm upon which the buildings stood was purchased twenty-five or thirty years prior to the levy, and was called the Owens farm, after the former owner. It had been reduced in the amount of land, by sales, from one hundred and one acres to about seventy-five acres. Dayton McKinney was living on the farm at the time of the first execution, but says he made no use of, and did not rent this adjoining land, called the McCarter lot, which was mostly covered with small wood. About one acre of it was cleared and cultivated, and it lay open, without a fence between it and the Owens land, and cattle sometimes ran in there.

The deputy sheriff who made the levy, says that he took the description from the mouth of the defendant, after asking him to describe all his property, and that the Andover farm was in that way written, originally, as containing one hundred and fifteen (115) acres, instead of seventy-five (75) acres, as it now appears. The number of acres is written in figures, and has evidently been altered from 115 to 75. The first figure is scratched, but not fully erased, and a large 7 and 5, with a different pen and ink, are written over the remaining figures. The deputy sheriff does not recognize them as his figures, and both the sheriff and he say they have no knowledge or recollection of the alteration. The sheriff says that the writ has been retained in his office since the levy, and that he first discovered the alteration after the receipt of the executions against the defendant, issued in favor of John McKinney and Hannah L. McKinney. The plaintiff testifies that he saw the return after it was made, and about the time the stay was given, February 11th, 1877, and that the contents were then written 115 acres; that he knew the lands well, and would have noticed if the smaller quantity, 75 acres, had been given.

The defendant does not explain why he withheld the Mc-
Carter lot, if he did so, but says he supposes he thought the
plaintiff had enough. It appears, from the proofs, that it
was a confessed judgment for debt, and has been stayed a
long time. The plaintiff, the sheriff, and his deputy, all say
that the change, by whomsoever made, was without their
knowledge or authority.

The return of levy must therefore be read as if it were
written one hundred and fifteen instead of seventy-five acres.
It would be a fraud on the plaintiff to permit a change to be
made in the levy after its return without notice to him. The
rule for determining the meaning of a levy made on lands
under execution, and returned in writing with the writ, is not
different from that which is applied in the construction of
other instruments in writing. Any description sufficient to
fix the bounds of the land is sufficient, or where it can be
fully identified and distinguished by the terms used; and it
may refer, for a proper description, to the deed of the debtors'
grantor, or to a recorded will, or in any other way where
there is sufficient given from the whole description to ascertain
or identify the premises, but extrinsic evidence will not be
admissible to show what land was intended to be levied on.
*Herman on Executions*, §§ 191, 192; *Choppel* v. *Hunt*, 8 *Gray*
427.

The evidence, therefore, which was taken in this case,
showing that the plaintiff, the sheriff and his deputy intended
to levy on all the real estate of the defendant, and supposed
they had done so, can have no legal effect in construing this
return. But the facts show that there were two distinct tracts,
formerly known as the Owens farm and the McCarter lot,
adjoining; that several parcels had been sold off the former,
and that what remained, added to the latter, made about one
hundred and fifteen acres of land. The plaintiff's testimony
that just before the levy was made the defendant, in conver-
sation with him, called this his Andover farm, and said it con-
tained from one hundred and fifteen to one hundred and
twenty acres, although the defendant says he has no recollec-

tion of such conversation, and he and his son testify that the balance of the Owens farm was called by him the "Andover farm," is evidence in the case.    These facts are competent to aid in locating and fixing the bounds of the land included in the levy.    If the forty acres in dispute are added to the Owens farm, we have the number of acres in the levy ; and it appears that it is joined by lands of John S. Wills, S. R. White, Mr. Van Syckel and others.    The only point of description where there appears to be doubt, is the occupancy of Dayton Mc-Kinney.    He is the son of William McKinney, and occupied the buildings on the Owens farm, and farmed the land on shares.    The McCarter lot was not tilled, but was growing up with young wood, excepting about one acre adjoining Mr. White's land, which was cultivated.    It is doubtful if this land was in the actual occupancy of Dayton McKinney, but this proof is not so positive that it should overcome the other descriptive terms in the return, and destroy the levy for its uncertainty.    There is enough left that is certain to identify the Andover farm and distinguish it from the other lands of the debtor.    If the Owens farm, which had for many years been so designated—containing, after deduction, about seventy-five acres—was intended, we are without explanation for the change of name to the "Andover farm ;" but if, after these several parcels had been sold off, the McCarter lot was added to it, and a new name given to the one hundred and fifteen acres thus joined, comprising all of the contiguous land of the defendant, we can see a reason for the change.

The rule of construction adopted by this court in *Griscom* v. *Evans,* 11 *Vroom* 402, 416, is applicable to this case—that where the description of land consists of several particulars of different degrees of importance, that subject matter will be selected to which those particulars apply, which are superior in number or importance, rather than that which corresponds with those of a lesser number or of minor consequence.    Here, if there be any misdescription to express the intention to levy on the two tracts together containing one hundred and fifteen acres, it is in the phrase " now occupied by Dayton McKin-

ney." The other terms can all be made to harmonize with the construction claimed by the plaintiff, and if this phrase be incongruous, it should be rejected as a false demonstration.

The order will be made that the proceeds of sale of the forty-acre tract be paid to John W. Wills, the plaintiff in the first judgment against William McKinney.